**STANDARD & POOR'S CORPORATION, INC., Plaintiff,**

v.

**COMMODITY EXCHANGE, INC., Defendant.**

**In the Matter of COMMODITY NEWS SERVICE, Applicant.**

**No. 82 Civ. 2545(MP).**

United States District Court, S. D. New York.

June 23, 1982.

Darby & Darby by William F. Dudine, Maxim Waldbaum, New York City, for plaintiff.

Seyfarth, Shaw, Fairweather & Geraldson by Daniel S. Greenfield, Michael L. Hirschfeld, Robert J. Feinstein, New York City, for applicant.

## OPINION

MILTON POLLACK, District Judge.

A trade newspaper service, claiming to have been barred from hearing plaintiff's confidential business procedures, i.e., plaintiff's trade secrets, testified to at a brief temporarily closed session of a civil suit, seeks an order unsealing the transcript of the record thereof, on First Amendment grounds. Its application is one of first impression; no previous case has been called to the Court's attention where the public press has sought access to trade secrets on First Amendment grounds.

The plaintiff, Standard & Poors ("S&P"), claimed in this suit that the defendant the Commodity Exchange Incorporated ("Comex") had unfairly used or planned to use S&P's trademarks and trade name in relation to futures contracts linked by Comex with the S&P 500 Stock Index and had violated the Lanham Act as well as state law against the dilution of the S&P trade name.[1]

The matter was brought on before the Court on an application for a preliminary injunction by S&P against Comex. During the hearings, S&P offered to prove among other things its unpublished and confidential internal management procedures in the supervision of the S&P 500 Stock Index as well as the identity of those within the organization responsible for monitoring the same. By agreement with the defendant, the plaintiff characterized and offered to present this information as confidential and trade secret matter, not available for public disclosure and requested that proof of it be taken in closed session and then sealed and kept confidential by defendant, its attorneys, agents and employees.

On application of the plaintiff during the testimony of its witness Anderson, the courtroom was accordingly cleared of persons not connected with the parties, for some 40–50 minutes, and the witness gave testimony which at various points included information which S&P claimed as confidential internal business, pertaining to the internal procedures and the identity of those who molded the data which resulted in the publicly available S&P 500 Stock Index. On the application for a preliminary injunction, the Court provisionally sustained plaintiff's claims of threatened irreparable damage and probability of success concerning its protected trade rights.

A trade newspaper service, the Commodity News Service, had one of its reporters present at the hearing. She was excused from the courtroom during that portion of the Anderson testimony pertaining to S&P's business confidences. The Service now seeks unsealing of the confidences and trade secrets of S&P testified to in closed session. This applicant professes in its post-hearing brief to seek only nonconfidential information and states it would respect S&P's right of protection of truly confidential trade secrets. The News Service has been furnished by S&P with a transcript of the non-confidential disclosures made by the witness. During the pendency of this motion a review of the transcript has led to further disclosure to the Service of nonconfidential material found to have been adduced.

The News Service argues that constitutional principle overcomes business confidentiality in this case. It faults the partial closing of the hearing before the Court had reviewed the confidences asserted to exist. The Service contends that it had an absolute enforceable right of open access to all that occurred in the administration of this civil case at the time it occurred.

---

1. S&P has licensed the Chicago Mercantile Exchange to use the S&P 500 Stock Index for commodities futures trading and has alleged that it does not wish to license any other exchange until it can appraise the effect on its reputation of such trading.

The Service seemingly also challenges that trade secrets are involved, contending obliquely, that S&P has previously disclosed everything concerning the ingredients of the S&P 500 Stock Index and their product, the Index itself.

For the reasons shown hereafter, the News Service's application will be denied; S&P made a reasonable claim of the existence of certain business confidences and was entitled to the benefit of any doubt thereof in this situation; the overriding interest to be found in business confidences—protected by law as trade secrets—required a temporary reasonably restricted access to the Courtroom of members of the public. Plaintiff was entitled to the safeguard of its business confidences and trade secrets. An interference with access to business confidences and trade secrets is not an abridgement of the freedom of speech and of the press protected by the First Amendment.

The timing of the closure was entirely consistent with the Court's acquaintance with the background through the pleadings, affidavits and contentions of the parties in respect of the temporary restraining order issued previously and the submissions on the application for a preliminary injunction up to that time. The Court was not, as the News Service suggests, acting merely on counsel's representations of the existence of business confidences in entertaining the closure application.

### The Confidential Information in the Sealed Anderson Testimony

In its decision enjoining Comex from trading on the S&P 500 Stock Index, this Court found that there were

certain inputs determined solely and exclusively by S&P based on special calculations and determinations known only to S&P. Only S&P knows the exact values of these inputs and the timing of their introduction into the S&P 500 Index. They are based upon S&P research and are arrived at by S&P's application of its expertise and skill.

The information which is not available to the general public and considered confidential to S&P in the administration of its

work in promulgating its 500 Index embraces the following:

1. The decision-making processes of Mr. Anderson and his staff and the timing thereof and the internal monitoring of the Index prior to public dissemination.

2. The composition, functions and responsibilities of the S&P 500 Committee, including the identification of such personnel, their backgrounds at S&P, their responsibilities and the nature of the actions they take in determining changes in the 500 Index.

3. The Operations Procedures Manual which sets forth in detail the decision-making processes identified above.

### The Law

1. A First Amendment Right to Attend A Civil Trial, Even If Implicated, Is Not Absolute

It should be observed at the outset that the press is not in any better position than any member of the public to demand that it be allowed to attend a judicial proceeding. "It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally.... Despite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathering in executive session, and the meetings of private organizations." *Branzburg v. Hayes*, 408 U.S. 665, 684–85, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626 (1972); also quoted in *Pell v. Procunier*, 417 U.S. 817, 833–34, 94 S.Ct. 2800, 2809–2810, 41 L.Ed.2d 495 (1974) in which the Supreme Court upheld a state prison regulation which prohibited the press from conducting interviews with prisoners it specifically requests to see.

Fed.R.Civ.P. 77(b) provides that "[a]ll trials upon the merits shall be conducted in open court and so far as convenient in a regular court room." The Supreme Court has not yet explicitly held that the public has a constitutional right under the First

and Fourteenth Amendments to attend *civil* trials but has noted that "historically both civil and criminal trials have been presumptively open." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 n.17, 100 S.Ct. 2814, 2829 n.17, 65 L.Ed.2d 973 (1980) (holding that there is a constitutional right to attend *criminal* trials). However, that presumption even when constitutionally compelled clearly can be overcome in proper circumstances. *See, e.g., Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (public does not have constitutional right to attend pretrial suppression hearing where the accused, the prosecutor and the trial judge all agree to the closure of that proceeding in order to assure a fair criminal trial).

Justice Stewart, concurring in the judgment in *Richmond Newspapers, Inc., supra*, would have held that the First and Fourteenth Amendments do give the press and public a right of access to civil as well as criminal trials, but even he noted that:

> [T]his does not mean that the First Amendment right of members of the public and representatives of the press to attend civil and criminal trials is absolute. Just as a legislature may impose reasonable time, place, and manner restrictions upon the exercise of First Amendment freedoms, so may a trial judge impose reasonable limitations upon the unrestricted occupation of a courtroom by representatives of the press and members of the public. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. at 600, 100 S.Ct. at 2840.

Of particular importance to the instant case, Justice Stewart further noted that:

> This is not to say that only constitutional considerations can justify such restrictions. *The preservation of trade secrets, for example, might justify the exclusion of the public from at least some segments of a civil trial.... See, e.g., Stamicarbon, N.V. v. American Cyanamid Co.*, 506 F.2d 532, 539–542 (CA2 1974). *Id.* at 600, n.5, 100 S.Ct. at 2840–41, n.5 (emphasis added).

### 2. Closure of Part of a Trial May Be Ordered to Preserve a Trade Secret and Avoid Irreparable Harm

█ In the *Stamicarbon* case cited by Justice Stewart, the Court of Appeals for the Second Circuit affirmed the lower court's denial of preliminary injunctive relief to restrain a defendant in a pending criminal contempt proceeding from disclosing trade secrets, on the ground that, the district court had not abused its discretion in finding the threat of irreparable harm insufficient to justify such relief. The Court was careful to explain, however, that a trial court may close criminal contempt proceedings to protect a party's interest in a trade secret where there *is* a sufficient threat of irreparable harm.

> It is interesting that the right to a public trial has also been limited on occasion to favor an interest held, not by the defendant or by the public at large, but by a private individual. It has long been recognized, for example, that the need to protect young complaining witnesses in rape cases against embarrassment, harassment and loss of reputation will suffice to invoke the shelter of limited privacy upon criminal proceedings....
>
> \* \* \* \* \* \*
>
> We think that this case would present an equally convincing justification for limited in camera procedures if, in the course of the contempt trial, the district judge should find that Stamicarbon was likely to suffer irreparable injury, and that protection of its secrets could be achieved with minimal disruption of the criminal proceedings.... We do not, however, think it irrelevant to our consideration that the Government here, at most, seeks only a fine against Cyanamid. *The precarious balance between private claims and the constitutional right to a public trial may be struck more easily when the accused is not faced with loss of liberty. Stamicarbon, N.V. v. American Cyanamid Co.*, 506 F.2d at 539–540 (emphasis added).

The *Stamicarbon* Court emphasized the importance of safeguarding trade secrets,

noting that a number of states had enacted statutes making unauthorized disclosure of trade secrets a crime.[2] "Unyielding preservation of the public trial right would in such cases present trade secret owners with the Hobson's choice of suffering an unprosecuted theft of their secrets, or allowing a prosecuted thief to broadcast the same secrets at trial." *Id.* at 540, n.11. Other Circuit courts have also recognized that the right to attend judicial proceedings should, in appropriate circumstances, give way to the right to protect one's trade secrets. *See, e.g., In re National Broadcasting Co.,* 653 F.2d 609, 613 (D.C.Cir.1981) ("It is equally clear, however, that the right to inspect and copy judicial records is not absolute.... The public has in the past been excluded, temporarily or permanently from, court proceedings or the records of court proceedings to protect private as well as public interests: to protect trade secrets....").

*The Law Applied Here*

■ *Stamicarbon* involved a criminal contempt proceeding and thus may well present a more stringent standard for determining when to restrict the public's right of access to a judicial proceeding than ought to be applied here.[3] Even using its standard, however, i.e. the weighing of possible irreparable harm against the amount of disruption to a fair trial closed proceedings would entail—this Court holds that the portions of the transcript not revealed to Commodity News Service should remain under seal. This Court finds that the testimony covered by these papers does constitute trade secret information not available to the general public and that this information if released would reveal how S&P maintains its position as the most reliable and accurate of the stock market indexers to the irreparable detriment of S&P. Even if the availability of the sealed information would not enable competitors to reproduce the Index, it would provide them with the methodology for rendering more accurate their indices and thus improving their competitive positions. Further, release of the names of the persons in charge of the S&P 500 Index might well subject such persons to pressure and harassment from investors or companies interested in inclusion in the Index, rendering it impossible for them to perform their jobs properly.[4] On the other hand, the disruption to the proceedings was minimal and temporary—the courtroom was closed for less than one hour during the whole of a five day hearing—and the defendant's consent to that closure is further indicative that there was no real threat to

2. New York State has such a statute, making it a felony to appropriate "secret scientific material." N.Y.Penal Law § 165.07 (McKinney 1975). The New York Court of Appeals, recognizing the importance of preserving the confidentiality of trade secrets, just recently held that though the Public Service Commission must under state statute make all proceedings and records public, it can issue orders to protect the confidentiality of trade secrets received in evidence. "[N]o rationale is suggested why the Commission should not extend the same evidentiary privileges and protection to trade secrets that a court would in a judicial proceeding." *New York Telephone Co. v. Public Service Commission,* 56 N.Y.2d 213, 451 N.Y.S.2d 679, 436 N.E.2d 1281 (N.Y.Ct.App.1982). *See also Sybron Corp. v. Wetzel,* 46 N.Y.2d 197, 207, 385 N.E.2d 1055, 1060, 413 N.Y.S.2d 127, 133 (1978); *Tymko v. K-Mart Discount Stores, Inc.,* 75 A.D.2d 987, 429 N.Y.S.2d 119, 120 (4th Dep't 1980); *Snyder v. Parke, Davis & Co.,* 56 A.D.2d 536, 537, 391 N.Y.S.2d 579, 580 (1st Dep't 1977).

3. *United States v. International Business Machines Corp.,* 67 F.R.D. 40, 47 (S.D.N.Y.1975) adopted essentially this standard in a civil lawsuit to resolve the question of whether material obtained as the result of discovery should remain sealed, holding that "[i]f disclosure is shown to work a clearly defined and very serious injury, continued sealed protection of the information will be maintained until the requirements of the fair administration of justice overrule this protection".

4. Commodity News Service (CNS) argues that since S&P has licensed its Index to the Chicago Mercantile Exchange (CME) for use in a stock index futures contract to be traded there, S&P has waived its right to assert a trade secret privilege. While CNS has standing to assert First Amendment claims of freedom of the press and access to judicial proceedings, it is NOT an investor in the CME stock index futures contract and has no standing to bring these purported Securities Exchange Act and Commodities Exchange Act claims.

defendant's right to, and the public's interest in, a fair trial.[5] Further, with the release of the non-confidential portions, the sealed portions have been kept to the minimum necessary to protect S&P's commercial secrets.

The discretionary timing of the closure was entirely consistent with the practicalities. It would be unrealistic to expect that the confidential data be isolated prior to or in the course of the oral presentation by the witness. Enough was shown to the Court by the pleadings, the motion papers, the prior testimony and the circumstances for the Court to accept the representation of counsel that confidential data would be included in the course of the balance of the witness testimony. The evidence adduced bore out what the Court accepted and believed was to be presented and the Court so found in sustaining the application for a preliminary injunction.

*Conclusion*

To have refused to close the proceedings during the testimony concerning the trade secrets would have, to paraphrase the *Stamicarbon* Court, put S&P to the Hobson's choice of not suing Comex for use of its name and Index, and indirectly thereby, use of its trade secrets in assuring the accuracy of that Index, or suing and losing forever all the proprietary value of that Index. This Court employed the least restrictive means practicable to preserve the confidentiality of legitimate and important trade secrets.

Accordingly, the non-confidential testimony having been furnished to the news service, the motion to vacate the seal order on the confidential testimony, is denied.

SO ORDERED.

---

5.  CNS cites a number of cases holding that one who seeks a prior restraint bears a heavy burden of justifying its necessity. It should be noted that the Closure and Seal Orders here were not prior restraints as they did not prevent the press from disseminating news already gathered. It should be further noted that the opinion chiefly relied on by CNS, *Reliance Insurance Co. v. Barron's*, 428 F.Supp. 200, 204 (S.D.N.Y.1977), employed the standard applied here in any event: "In order to satisfy its 'heavy burden justifying a prior restraint' plaintiff, in this suit, is required to demonstrate that the material to be restrained is, indeed, confidential, *and* that its publication would cause plaintiff to suffer serious and irreparable injury." (emphasis in original).